# UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

|  |  |
|---|---|
| In re:<br><br>GOOD DAY CORPORATION,<br><br>      Debtor. | Case No. 05-11832-RGM<br>(Chapter 7) |

## MEMORANDUM OPINION

This case is before the court on the motions of Good Day Corporation to reconsider or to alter or amend this court's order of August 12, 2005 dismissing this case and its motion for an expedited hearing on its motion.

## Background

Good Day Corporation, a restaurant, filed a voluntary petition in bankruptcy under chapter 7 of the Bankruptcy Code in this court on May 12, 2005. The petition was filed pursuant to a resolution of the Board of Directors of Good Day Corporation passed at a special meeting of the Board of Directors on May 10, 2005. An unsigned copy of the resolution, certified as a true copy by Yupin Raungtriphop, the president of the debtor, was attached to the petition. Ms. Raungtriphop executed the petition on behalf of the debtor corporation.

On May 23, 2005, Vasin Wansa, Steve Russo and Vandee Sethanand[1] delivered a letter to the court asserting that they were the majority shareholders of the corporation and that they "never

---

[1]The three shareholders, Vasin Wansa, Steve Russo and Vandee Sethanand, will be referred to collectively as "the shareholders." Ms. Sethanand is the principal shareholder and asserts that she owns more than 52.08% of the outstanding stock of the debtor.

1

had a meeting nor a resolution to bankrupt" the corporation.  Letter (Docket Entry 21).  They were not represented by counsel.  The court treated the letter as a motion to dismiss the bankruptcy case as having been filed without authorization of the debtor and set the matter for a hearing on June 14, 2005.  The movants did not appear at the hearing.  Corporate business is normally transacted by the officers of a corporation under the authority of a board of directors.  Shareholder approval is not normally required for corporate actions.  A board of directors resolution, proper in form, was filed with the petition and there was no indication that the corporate governance documents of the debtor required shareholder approval for filing a petition in bankruptcy.  The court, therefore, denied the motion to dismiss the bankruptcy petition.

Meanwhile, there was activity to sell the assets of the debtor, that is, the restaurant and the lease for the premises.   H. Jason Gold was initially appointed trustee of the debtor but resigned on May 17, 2005 because, he concluded, he was not disinterested.  Donald F. King was appointed successor trustee and the first meeting of creditors was rescheduled for June 22, 2005.  (Docket Entries 9 and 16).  The petition signed by Ms. Raungtriphop stated, "Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors."  Petition at 1.  (Docket Entry 1).  Consequently, the notice of the original first meeting of creditors and the notice of the rescheduled first meeting of creditors advised creditors not to file proofs of claims unless they received a further notice requesting proofs of claims be filed.  About the same day that Mr. King was appointed successor trustee, he requested that an asset notice be mailed to all creditors advising them to file proofs of claims.  The promptness with which he requested the asset notice is unusual and he should be commended for his promptness.  Absent unusual circumstances, asset notices are not requested in apparent no-asset cases until

potential assets are identified. This does not usually occur before the first meeting of creditors. The promptness of the request for the asset notice suggests that the trustee received information not contained in the petition almost immediately upon his appointment.

On June 10, 2005, the trustee filed a motion seeking to assume the lease for the restaurant premises, sell the restaurant and assign the lease to Chairod and Yupin Raungtriphop for $50,000 plus arrearages on the lease of $11,417.69.[2] (Docket Entry 27). The trustee also requested that the objection period be reduced and that the court set the matter for an expedited hearing. (Docket Entries 28 and 29). The motion was filed before the first meeting of creditors and before the hearing on the shareholder's letter objecting to the filing of the case. A hearing was set on the trustee's motion to sell for July 5, 2005.

On June 30, 2005, Russell B. Adams, III, entered his appearance on behalf of the shareholders, filed a motion to reconsider the denial of their motion to dismiss the case and objected to the sale of the restaurant. The motion for reconsideration sets out at length the shareholder's theory of the case. Simply put, they assert that the individuals holding themselves out as the current directors are usurpers.

The parties agree on some facts. The first Board of Directors was elected at the organizational meeting on December 15, 2002 and consisted of Ms. Raungtriphop, Chairod

---

[2]This appears to represent the May and June 2005 rent. The schedules, dated May 12, 2005, suggest that the rent is $5,970.00 a month. Schedule F, "Creditors Holding Unsecured Nonpriority Claims", lists the landlord as an unsecured creditor with a claim of $5,970. The landlord asserts that the regular monthly rent is $6,147,64. Landlord's Opposition to Assumption and Assignment of Non-Residential Lease in the Absence of Required Cure of Rental Default, ¶4 (Docket Entry 34). Chairod and Yupin Raungtriphop are ostensibly the sole guarantors of the lease. *See* Schedule H, "Codebtors"; Trustee's Motion for Authority to Sell, ¶4 (Docket Entry 27). But, at the July 5, 2005 hearing on the sale of the restaurant, debtor's counsel stated, "Now, in fairness to everybody, I believe the Sethanand's are also guarantors and that they were the original guarantors and that the Raungtriphops agreed to become obligated as additional guarantors as a condition of having the lease assigned back to the corporation." Tr. at 20. If the Sethanands and the Raungtriphops are co-guarantors, there may be rights of contribution between them.

Raungtriphop, Ms. Sethanand and Mr. Russo.  A shareholder's meeting was called for May 10, 2003

which all the shareholders attended – at the beginning.  The shareholder's meeting was unable to

continue when the participants were ordered out of the meeting room and the lights were turned off.

This resulted from Ms. Raungtriphop's assertion at the meeting that Ms. Sethanand could not vote

all of her shares, thereby reducing her 52.08% voting majority to a 44.32% voting minority, all of

the other shareholders intending to vote their shares as a block.[3]  All the shareholders except Ms.

Sethanand reconvened the shareholder's meeting at another location, removed the incumbent

directors and elected their successors: Ms. Raungtriphop, Chairod Raungtriphop, Don Chapman and

Mr. Russo.   A quorum for transacting business at a shareholder's meeting is a majority of

outstanding shares entitled to vote.[4]  By-Laws, Article II, §5.  Two years later, on May 10, 2005, this

Board of Directors[5] purported to authorize the filing of the petition in this case.

The narrow focus of Ms. Sethanand's motion to dismiss the bankruptcy case is the validity

of the election of the new Board of Directors at the rump meeting of shareholders on May 10, 2003.

If a quorum of shareholders was present, the new Board was validly elected and the petition was

---

[3]Ms. Sethanand is the owner of 2,083 shares of common stock of the corporation as evidenced by Certificate #1, dated December 15, 2002 and signed by Ms. Sethanand as president and Ms. Raungtriphop as secretary.  The 2,083 shares represent 52.08% of the outstanding stock of the corporation.  The rest of the stock is owned by three individuals: Yupin Raungtriphop (1,430 shares, Certificate #2); Vasin Wangsa (140 shares, Certificate #3); and Steve Russo (347 shares, Certificate #4).

[4]Article II, Section 5 also states:

In the absence of a quorum, a majority in voting power of the stockholders present in person or represented by proxy and entitled to vote may adjourn the meeting from time to time and from place to place until a quorum is obtained.  At any such adjourned meeting at which a quorum is present, any business may be transacted which might have been transacted at the meeting as originally called.

[5]The debtor asserted that Mr. Russo either resigned or was removed from the board by the other three board members.  They purported to elect Pichina Bell, the Raungtriphop's sister-in-law, as his successor.  Tr. 32.  The court found that Mr. Russo did not resign from the board.

properly authorized.  If a quorum was not present, the purported election of the new Board was invalid and the petition was not properly authorized.

The dispute over Ms. Sethanand's ownership of 555.47 shares arose almost immediately after the organizational meeting on December 15, 2002.[6]  Suit was filed in the Circuit Court of Prince William County, Virginia, in January 2003 and a counterclaim was filed on February 20, 2003.  The counterclaim sought resolution of the issue relating to Ms. Sethanand's stock ownership and sought to have the court declare that she was the owner of 1,527.53 shares rather than 2,083 shares because of the failure to pay into the corporation capital of $40,000.  Thus, 555. 47 shares are in dispute.  This suit it still pending in the state court.

The July 5, 2005, hearing on the trustee's motion to sell the debtor's assets to Chairod and Yupin Raungtriphop proceeded without hearing the shareholder's motion for reconsideration which was scheduled for July 19, 2005.[7]  After considering whether to authorize a sale, the court granted the trustee's motion and held an auction.  The Raungtriphop's initial offering price was $50,000 plus $20, 150.33 to cure the defaults under the lease.  After spirited bidding between the Raungtriphops and an investor group consisting of the Sethanands and others, the Raungtriphops won the auction with a bid of $140,000 plus the $20,150.33 cure payment.  The Raungtriphops paid the trustee the $140,000 purchase price and cured the arrearage with the landlord.

---

[6]While it was not material for the disposition of the motions previously decided or the disposition of the motion before the court, the Raungtriphoops allege that in January 2003, Duangrudee Thandee requested that stock be issued to her for her $40,000 capital contribution to the corporation.  Ms. Sethanand asserts that this subscription had been assigned to her and was included in the stock issued to her.  There is a reference the December 22, 2002 memorandum from Donald E. Nelson, the attorney representing the corporation during is incorporation phase, to Ms. Raungtriphop that states:  "Also, the Sethanand ownership interest includes money from an early investor whose interest was purchased, with no liability to the corporation."

[7]The sale motion was heard by the Hon. Stephen S. Mitchell.

The July 19, 2005 hearing on the Sethanand's motion for reconsideration was continued to a time-certain on August 8, 2005 and heard on that date.  The court granted the motion to reconsider because the shareholders did not receive notice of the original hearing on their motion.  The court held an immediate hearing on the shareholder's underlying motion to dismiss.  The crucial issue was the validity of the May 10, 2003 rump shareholder's meeting.  This turned on the presence of a quorum.  The Raungtriphops asserted that the Circuit Court had enjoined Ms. Sethanand from voting 555.47 shares of her stock which reduced the outstanding shares eligible to vote to 3,444.53 shares and a quorum to 1,722.265 shares.  Ms. Raungtriphop, Mr. Russo and Vasin Wangsa owned a total of 1,817 shares and would, under this argument, have constituted a quorum.  When confronted with this argument at the beginning of the May 10, 2003 shareholder's meeting, Ms. Sethanand left the meeting and her attorney – in whose office the meeting was being held – turned off the lights and asked the three remaining shareholders and Donald E. Nelson, their attorney, to leave.  The three remaining shareholders and Mr. Nelson went to the restaurant, held the rump meeting and elected the new board.

Mr. Nelson was also the attorney who represented the corporation during its incorporation phase.  He testified at the August 8, 2005 hearing that the Hon. LeRoy Millette, Jr., a judge of the Circuit Court of Prince William County, enjoined Ms. Sethanand from voting about 555 shares of her stock before the May 10, 2003 meeting and that this reduced her voting shares to less than 50% of the outstanding stock.[8]  The By-Laws were received into evidence.  Mr. Nelson became less certain of his recollection when confronted on cross-examination with a certified copy of an order entered by the Circuit Court of Prince William County in the suit between the parties entitled "Order

---

[8]Mr. Nelson testified to the same thing at the July 5, 2005 sale hearing before Judge Mitchell.  Tr. 26.

Granting Preliminary Injunction" entered by Judge Millette on May 30, 2003, twenty days **after** the

May 10, 2003 rump meeting of the remaining shareholders. More importantly, the injunction

enjoined **all** shareholders from voting any of their shares. It preserved the status quo. The

Raungtriphops presented no other injunction order.

From all of the evidence, particularly the unrebutted May 30, 2003 preliminary injunction,

this court concluded that on May 10, 2003 Ms. Sethanand had the right to vote all of her shares of

stock and that they constituted a majority of the outstanding voting stock. When she withdrew from

the shareholder's meeting, the quorum was lost and any action taken by the remaining shareholders

at their rump meeting was invalid. The board elected at that meeting was not validly elected and

the real Board of Directors was the initial board which consisted of Ms. Raungtriphop, Chairod

Raungtriphop, Ms. Sethanand and Mr. Russo. That board never met and never authorized the filing

of this bankruptcy.

The issue of the effect of dismissal of the case on the validity of the July 5, 2005 sale was

addressed. The court found that because the filing of the petition was not properly authorized, the

sale was invalid. The court considered the Raungtriphop's change of position in reaching this result.

The court found that the Raungtriphops were insiders who were held out as the sole guarantors on

the lease. The $140,000 purchase price paid to the trustee could be fully refunded. The $20,150.33

paid to the landlord could not be refunded because the landlord was not before the court. However,

since the payment was the payment of money, the Raungtriphops had an adequate remedy at law to

recover the funds from the debtor. Of course, if the debtor is truly insolvent, they would have had

to pay it in any event as a result of their guarantee. Finally, all of the parties were fully aware of the

pendency of the motion for reconsideration and the possible consequences. The hearing on the

trustee's sales motion was advanced on the docket to accommodate the Raungtriphops and to prevent what they considered further erosion of the future prospects of the restaurant that would have been detrimental to them.

## The Debtor's Motion to Reconsider

The debtor seeks reconsideration of the court's order of August 12, 2003 dismissing this case.  The factual essence of the debtor's motion is that the Circuit Court did enter an order on May 9, 2003 enjoining Ms. Sethanand from voting 555 shares of her stock.  The debtor, then using the same analysis as the court used, argues that this reduced the outstanding shares of stock entitled to vote and reduced Ms. Sethanand's holdings entitled to vote to 44.32%.  Since all of the remaining shareholders were present at the rump shareholder's meeting, there was a quorum and the election of the new board was valid.[9]  The debtor attached a certified copy of the May 9, 2003 preliminary injunction to its motion.

The debtor explains its failure to present this evidence at the August 8, 2005 hearing.  Its principal witness, Mr. Nelson, an attorney, did not have his file at the time of the August 8 hearing.  "At that time, all such files had been turned over to counsel handling the Prince William County litigation, and Nelson was unable to access his files and records until this past week."  The debtor continues, "Upon obtaining access to his files and records, and ***upon reviewing the court files maintained at the Prince William County Circuit Court, Nelson was able to determine . . .***" (emphasis added) that the Circuit Court entered an order on May 9, 2005 enjoining Ms. Sethanand

---

[9]If Mr. Russo were still a member of the Board of Directors, Mr. Russo's failure to attend the May 10, 2005 board meeting, the debtor might argue, was irrelevant.  The other three members were present and constituted a quorum.  This overlooks the value of Mr. Russo's potential contributions to the meeting.  Had he attended, he might have convinced the remaining directors to pursue a different course of action.

from voting 555 shares of her stock.  Memorandum to Reconsider or to Alter or Amend Pursuant

to Rule 9023 at 4. (Docket Entry 49).

The debtor asserts that Ms. Sethanand misled the court.  It states:

> To produce the May 30 order and submit that it is the only restriction
> on voting of shares imposed by the Prince William County Circuit
> Court when the parties have full and actual notice of the rulings of
> such court is nothing short of misleading.  Such actions provide cause
> to reexamine the evidence presented herein and to reconsider the
> Dismissal Order.

Memorandum at 5.

Thus, the debtor argues, the court should reconsider its August 8, 2005 order under

F.R.Civ.P. 59(e) which is incorporated into Rule 9023 of the Federal Rules of Bankruptcy

Procedure.  Alternatively, the debtor should be granted a new trial under Rule 59(a).  Additionally,

the debtor argues that the Raungtriphop's cannot be put back into their prior position.  They have

changed their position to their detriment.  They expended money to cure the defaults under the lease

and to re-open the restaurant.

The trustee joins in the debtor's motion and raises concerns about payment of his fees.

## Discussion

The law relating to Rule 59(e) is well established in the Fourth Circuit.  The Court of

Appeals stated:

> Although Rule 59(e) does not itself provide a standard under which
> a district court may grant a motion to alter or amend a judgment, we
> have previously recognized that there are three grounds for amending
> an earlier judgment: (1) to accommodate an intervening change in
> controlling law; (2) to account for new evidence not available at trial;
> or (3) to correct a clear error of law or prevent manifest injustice. *See
> Lockheed Martin Corp.,* 116 F.3d at 112; *Hutchinson v. Staton,* 994

F.2d 1076, 1081 (4th Cir.1993). Thus, the rule permits a district court to correct its own errors, "sparing the parties and the appellate courts the burden of unnecessary appellate proceedings." *Russell v. Delco Remy Div. of Gen. Motors Corp.,* 51 F.3d 746, 749 (7th Cir.1995). Rule 59(e) motions may not be used, however, to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance. *See Russell,* 51 F.3d at 749; *Concordia College Corp. v. W.R. Grace & Co.,* 999 F.2d 326, 330 (8th Cir.1993); *FDIC v. World Univ., Inc.,* 978 F.2d 10, 16 (1st Cir.1992); *Simon v. United States,* 891 F.2d 1154, 1159 (5th Cir.1990); *see also In re: Reese,* 91 F.3d 37, 39 (7th Cir.1996) ("A motion under Rule 59(e) is not authorized 'to enable a party to complete presenting his case after the court has ruled against him.' ") (quoting *Frietsch v. Refco, Inc.,* 56 F.3d 825, 828 (7th Cir.1995)); 11 Wright et al., Federal Practice and Procedure § 2810.1, at 127-28 (2d ed. 1995) ("The Rule 59(e) motion may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to the entry of judgment."). Similarly, if a party relies on newly discovered evidence in its Rule 59(e) motion, the party "must produce a 'legitimate justification for not presenting' the evidence during the earlier proceeding." *Small v. Hunt,* 98 F.3d 789, 798 (4th Cir.1996) (quoting *RGI, Inc. v. Unified Indus., Inc.,* 963 F.2d 658, 662 (4th Cir.1992)). In general "reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." Wright et al., *supra,* § 2810.1, at 124.

*Pacific Ins. Co. v. American Nat. Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir. 1998).  Chief Judge Tice

of this court summarized the rule in the Fourth Circuit:

> Federal Rule of Civil Procedure 59(e) permits the court to correct errors by amending an earlier judgment. Three limited grounds for amendment are recognized in this circuit:  (1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice. *Pacific Ins. Co. v. Am. Nat'l Fire Ins. Co.,* 148 F.3d 396, 403 (4th Cir.1998), *cert. denied,* 525 U.S. 1104, 119 S.Ct. 869, 142 L.Ed.2d 771 (1999).

*In re Property Technologies, Ltd.,* 296 B.R. 701, 703 (Bankr.E.D.Va. 2002).

10

The first basis for relief under Rule 59(e), to accommodate an intervening change in controlling law is not argued by the debtor. Instead, it relies on the second and third bases. The motion argues that there is new evidence, that is, the existence of the May 9, 2003, preliminary injunction entered by the Circuit Court.

> In this circuit, the standard governing relief on the basis of newly discovered evidence is the same whether the motion is brought under rule 59 or rule 60, .    .   .  and rule 60 requires that a party demonstrate: (1) the evidence is newly discovered since the judgment was entered; (2) due diligence on the part of the movant to discover the new evidence has been exercised; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that is likely to produce a new outcome if the case were retried, or is such that would require the judgment to be amended. . . .Thus, in order to support a motion for reconsideration, "the movant is obliged to show not only that this evidence was newly discovered or unknown to it until after the hearing, but also that it could not with reasonable diligence have discovered and produced such evidence at the hearing." Frederick S. Wyle P.C. v. Texaco, Inc., 764 F.2d 604, 609 (9th Cir.1985) (citations and quotation marks omitted). . . Evidence that is available to a party prior to entry of judgment, therefore, is not a basis for granting a motion for reconsideration as a matter of law.

*Boryan v. United States,* 884 F.2d 767, 703-704 (4th Cir. 1989)(citations omitted).

At first blush, the discovery of the May 9, 2003 preliminary injunction does not appear to qualify as newly discovered evidence. It was available to all the litigants from a public source, the Clerk of the Circuit Court. It was an order entered in a case still pending in the state court in which all the parties presently before this court are parties. The issue was not one that surprised the debtor. Ms. Sethanand clearly set forth her theory of the case in her memorandum in support of her motion for reconsideration and in his argument before Judge Mitchell on July 5, 2005. Tr. 8. Counsel for the debtor referred to the suit and the order in the hearing before Judge Mitchell. Tr. 14, 16-17. Mr.

11

Nelson had a recollection of such an order in his testimony both before Judge Mitchell on July 5, 2005 and this court on August 8, 2005.  Tr. 27-28.

It appears that the third basis for reconsideration, to prevent a manifest injustice, is most likely the basis upon which the debtor will rely.  The debtor appears to rely on the belated discovery of the May 9, 2003 order, the inference that Ms. Sethanand suppressed it, and that in presenting the May 30, 2003 order she implicitly represented that it was the only injunction.  There may be some difficulties with this approach.

The manifest injustice basis is a much broader basis than either of the first two.  Its breadth, though, should not be so large as to encompass the two more specific bases.  It cannot be used as a substitute for an after-discovery evidence argument when that basis cannot itself be maintained. There must be more.  The debtor asserts that there is more, a fraud on the court.  Here, though, the court looks to Rule 60(b)(3) which permits a litigant to avoid an unfavorable judgment if it was obtained by fraud or misconduct.  Perjured testimony is itself not a sufficient foundation for a Rule 60(b)(3) motion.  The basis for the adversary system of litigation is the belief that if the interested parties have the ability to present their case, they will present it in the light most favorable to themselves and in the process, the truth will be discerned.  The function of the trial is to test the truthfulness of the evidence presented.  This is the basis for cross-examination itself and the requirement for the authentication of documentary evidence.  In this case, cross-examination of Mr. Nelson effectively caused Mr. Nelson to doubt his own recollection.  To allow every unsuccessful litigant to reopen a case based on evidence that he says shows fraud or misrepresentation by the opposing party would mean that there would be no end to litigation.  It would reward litigants who

12

did not adequately investigate, prepare or present their case.  Perhaps they ought to have won, but that is not enough.

Rule 60(b)(3) requires  fraud or misconduct that prevents one party from fairly presenting his case.  It must be fraud that interferes with the adversary process itself.  The failure to provide documents in discovery may be the basis for Rule 60(b)(3) relief.  *Schultz v. Butcher,* 24 F.3d 626, 630-631 (4th Cir. 1994).  That is not the case here.  While there is a clear language barrier between the Raungtriphops, the Sethanands and all counsel in this case, the document at issue, the May 9, 2003 preliminary injunction was equally available to all the parties.  If counsel for Ms. Sethanand should have found the May 9, 2003 preliminary injunction, it seems that counsel for the debtor should have as well.[10]  More importantly, Ms. Sethanand interposed no obstacle preventing the debtor from finding it (which debtor's counsel clearly thought existed) or presenting it at the trial.

### Concerns of the Court

The court will hold a hearing on the debtor's motion.  Whether it will be granted depends on the evidence to be presented.  The court is taking some time to discuss the matters before it because it is concerned about the totality of this bankruptcy case and the course it has taken to date.  Its concerns, however, are different than those presented in the debtor's motion for reconsideration.  The court recognizes that much of the following discussion is based on opening statements of counsel, argument of counsel and potential inferences.  None of the issues has been directly addressed and little evidence relating to them has been presented.  The court has reached no

---

[10]Ms. Sethanand's counsel stated at the July 5, 2005 hearing, "I must say I'm not completely versed in everything that has gone on.  I just came into this last week."  Tr. 8.

conclusions. The purpose of the following discussion is to alert counsel to what appear to be lurking

questions so they may be prepared to address them.

The court is more concerned about the propriety of the filing of this case than the authority

of the Board of Directors to file it. Clearly, if the board was not properly constituted the case must

be dismissed because there was no authority to file the petition. The factual basis for the board's

authority is, therefore, critical. But, even if the petition was properly authorized, it may not be a

proper use of the bankruptcy system. It may have been filed in bad faith.

The effect of the filing of the petition and the sale of the corporate assets is to resolve a

shareholder dispute. The dispute, though, is not resolved on its merits, but by the relative wealth

of the parties, that is, who can afford to pay more for the assets.[11] The rights of the shareholders as

shareholders are abrogated by this process.

Bankruptcy courts are skeptical of bankruptcy cases that are in reality two-party civil

disputes. The two parties are generally the debtor and a creditor. Either one or the other believes

that he may obtain an advantage in resolving the dispute by resorting to bankruptcy. This case is

essentially a two-party dispute, but, interestingly, does not involve a debtor-creditor relationship.

The dispute is between shareholders.[12] The dispute began in January 2003 and immediately resulted

---

[11]At the July 5, 2005 hearing, the Raungtriphop's bid over $160,000 and paid it within ten days. While there
is no indication of where the money came from, it is clear that Ms. Sethanand was unable to bid against the
Raungtriphops herself. She had to enlist the aid of another investor. Even if they both have equal financial capacity,
the resolution is still a non-merits based resolution.

[12]Debtor's counsel stated at the July 5, 2005 hearing:

I think it's important to note that the movants that Mr. Adams represents [the Sethanands] are putative
shareholders and the issue of exactly who are the shareholders and how many shares they own has
been the subject of ongoing litigation in the Prince William County Circuit Court for some time.

Tr. 14.

(continued...)

in a suit being filed in Prince William County Circuit Court, a suit that is still pending.   The

shareholder dispute is a state law matter over which federal courts have no jurisdiction.

Skepticism is warranted in this case.   In filing the petition, Ms. Raungtriphop stated on the

petition that this was a no-asset case.   The schedules support that conclusion.   However, Mr. King

immediately requested an asset notice be sent to creditors, an unusual step at that stage of the

proceedings and not warranted by the schedules and statement of financial affairs without further

information which is typically obtained at the first meeting of creditor.   The Raungtriphops

apparently immediately contacted the trustee and made their offer to purchase the assets of the

insolvent debtor which had lost over $80,000 in the preceding 18 months.   They offered more than

$70,000 for the assets and to cure the arrears on the lease.[13]   Debtor's counsel stated at the July 5,

2005 hearing:

> When I filed this case, I frankly called Mr. [Cerroni], upon the day of
> filing, who has been acting as counsel to the Sethanands I advised
> him of the filing.  I suggested that this appeared to be maybe the most
> appropriate way to sort of resolve the ownership issues and address
> the liquidation of the restaurant assets, per se.
>
> They've [the Sethanands] known for some time, frankly, that this
> potential for purchase of the restaurant assets was going to be brought
> up and submitted to the trustee.
>
> My suggestion to Mr. [Cerroni] which I thought was well taken at the
> time was:  Let everybody appear in court with their checkbooks.

---

[12](...continued)
[The Raungtriphops] do not have [the] belief that the restaurant can be run profitably with the *warring factions* as has existed over the last year and a half.

Tr. 20 (emphasis added).

[13]At the July 5, 2005 hearing Ms. Raungtriphop testified that the restaurant had been losing money for almost eighteen months. Tr. 36.  During that time, Ms. Raungtriphop who was managing the day-to-day affairs of the restaurant did not take a salary.  Tr. 36. The deficiency was funded by Mr. Raungtriphop from another business.  "We have to put the money in every month or sometimes up to 5,000." Tr. 35, 36.

> I do believe that this is the reasonable universe of bidders on this asset. I don't think this business has generated enough income potential or certainly profit potential to be able to verify or justify taking it to market with some sort of a broker.

Tr. 21.

Ms. Sethanand does not want the corporation dissolved. Judge Mitchell asked Ms. Sethanand's counsel, "[W]hat's the difference between winding up the affairs of this company in Chapter 7 and winding it up in state court?" Tr. 10. Counsel replied that his clients did not want the corporation to wind up. "[T]hey want to come back in, take control of the restaurant as majority shareholders and run the business." Tr. 10. This was feasible because the non-insider debts were not that large. "[T]he big majority percentage of the debts, of the unsecured debts, are loans from [the Raungtriphops] to the corporation which are disputed." Tr. 10.

Except to enable the Raungtriphops to purchase the corporate assets and obtain an assignment of the lease, no other reason for filing this case is readily apparent. Typical legal advise to a failing corporation is to windup the corporation's affairs outside bankruptcy. There is generally no advantage to filing a chapter 7 petition. The corporation will not be granted a discharge. The trustee will typically abandon all or most of the corporate assets and the corporate debtor will be in the same position six or twelve months after filing bankruptcy as it was before filing. While there are reasons for a corporate chapter 7 filing, such as assuring payment of withholding taxes for which the owners may also be liable in preference to unsecured trade creditors, none are indicated in this case.

Moreover, the "crisis" that precipitated the filing, the arrears to the landlord, appears to have been manufactured by the Raungtriphops. They voluntarily funded the restaurant's monthly deficient for 18 months, but in May 2005, did not pay the rent. While they may not have been

16

obligated to continue to voluntarily fund the debtor's monthly deficit, the apparently unannounced

termination of their prior practice, coupled with the filing of the petition and their individual offer

to the trustee to buy the corporate assets raises troubling questions, especially where, as here, the

effect of the refusal to further fund the monthly deficits may actually have been intended only to

delay funding for a short time – a time long enough to acquire total control of the corporate assets.

The Raungtriphops moved very quickly. They made an immediate offer to the trustee to buy all of

the corporate assets and have the lease assigned to them. The amount of the offer cured the rental

arrears[14] and paid all non-insider creditors.[15] They urged the trustee to request an expedited hearing

on their offer to purchase the corporate assets.[16] All of this minimized the time that the restaurant

would be closed and the amount of the rent that would accrue while there was no income.[17]

---

[14]The arrears appears to have commenced with the May 2005 rent. It appears that the February rent was paid on February 8; March rent on March 7; and April rent on April 8. *See* Statement of Financial Affairs, Attachment to Question 3. The petition was authorized on May 10 and filed on May 12.

[15]Under the initial offer, there would be no money available to distribute to shareholders.

[16]The trustee did not market the restaurant. There was the following exchange between Judge Mitchell and Mr. Reynolds, the trustee's counsel, at the July 5, 2005 hearing:

> THE COURT: What attempt has the trustee made to market this besides getting an offer from the insiders [the Raungtriphops]?
>
> MR. REYNOLDS: Your Honor, we have not made an attempt to market the property.
>
> One of the major concerns and one of the reasons for the immediacy and trying to get a sale and why it's difficult to market is because of the landlord. There's a number of months in arrears prior to filing the bankruptcy. The estate has no funds to pay the landlord after the bankruptcy filing.
>
> We are butting up on a day where the lease can be deemed rejected, just because we're coming up on the 60 days after the bankruptcy filing.

Tr. 13.

[17]They closed the restaurant on the day the petition was filed. Tr. 7. While this was proper – the trustee is the only party who may operate the restaurant after filing and then only if authorized by §721 – it is not clear that a short closing would have injured the restaurant in the long run.

Ms. Raungtriphop testified that the deficit was caused by the failure to obtain a liquor license. Tr. 34-35. No liquor license could issue unless the Sethanand's consented and they would not consent. Tr. 34-35.[18] The fair inference is that if the liquor license could be obtained, the restaurant would become profitable. That could not be accomplished with the Sethanand's remaining as shareholders.

The opening statements and arguments of counsel suggest the inference that the Raungtriphops planned to cause the debtor to file a chapter 7 bankruptcy petition, make an offer on their own behalf to the trustee for the corporate assets that was too significant to reject, have the lease assigned to them under §363, get the liquor license and run a successful restaurant without the Sethanands as troublesome shareholders. An added bonus could be that the two-and-a-half-year Circuit Court suit would become moot.

The problem with this scheme, if it was a scheme, is that the Bankruptcy Code was not designed to accomplish this result. Bankruptcy is a judicial proceeding to resolve a community problem, the insolvency of the debtor indebted to many creditors. It is not a judicial proceeding to resolve a private shareholder dispute in a corporation that both shareholders want to own and continue to operate. The Bankruptcy Code gives a trustee significant powers that are not available in state court proceedings. A trustee may quickly force the sale of the corporate assets. However, §13.1-724 of the Code of Virginia (1950) requires two-thirds shareholder approval for such a sale.[19] That could obviously not be achieved in this case even if Ms. Sethanand's share holdings are

---

[18]Ms. Raungtriphop testified that the liquor license could not be issued unless all shareholders with more than a ten percent interest in the business joined in the application. Ms. Sethanand, she testified, refused to do this. Tr. 34.

[19]The Articles of Incorporation do not provide otherwise. Va.Code (1950) §13.1-724(E).

reduced by 555.47 shares.[20]  A trustee may force the landlord to accept a new tenant.  Bankruptcy

Code §363.  There is no release of guarantors in such a transaction.  Here, debtor's counsel believes

that the Sethanand's are guarantors.  Tr. 20.[21]  If the Circuit Court ordered the winding-up of the

corporation's affairs, the lease would more likely be terminated and all the guarantors would face

the same exposure.  Here, if the restaurant is sold by the trustee – and if the Sethanands are

guarantors of the lease – they would have no say in the operations of the "new" restaurant, would

be entitled to no information concerning its financial affairs, but would remain liable on the lease.

A chapter 7 bankruptcy case focuses on liquidating assets and paying creditors, not on

preserving shareholders' equity.[22] A state court proceeding involving a shareholder dispute focuses

on preserving the corporation and shareholders' equity while resolving the dispute.  Here, both the

Raungtriphops and the Sethanands appear to believe that the restaurant is a viable entity.  The

Raungtriphops were willing to pay more than $160,000 for it.[23]

If there was a scheme, new questions may have to be addressed: What is a director's

responsibility to a shareholder in these circumstances?  *See* Va.Code (1950) §13.1-690.  Have the

directors used their office for their personal gain at the expense of the corporation or the other

shareholders?  *See* Va.Code (1950) §§13.1-691 and -691.1.  Is such a scheme purged of its taint by

[20]In fact, filing a petition for chapter 7 bankruptcy relief is closely akin to dissolution of a corporation, an action that may only be authorized by a two-thirds vote of the shareholders.  *See* Va.Code (1950) §13.1-742(E).

[21]This is not reflected on the schedules and no evidence was presented on this issue.

[22]There is no equity if a corporation is insolvent, but the, solvent corporations do not normally file chapter 7 petitions.  Insolvent, illiquid, potentially viable corporations file chapter 11 petitions.

[23]For comparison purposes, the schedules as amended reflect 13 non-insider, non-professional creditors with scheduled claims of about $20,800; three scheduled professionals – two attorneys and one accountant – with scheduled claims of about $23,000; and insider claims scheduled at $157,350 of which $134,350 is scheduled as owing to either Mr. or Mrs. Raungtriphop.  Ms. Sethanand is scheduled as a contingent, disputed and unliquidated creditor with a claim in an unknown amount.  Properly skeptical, Judge Mitchell inquired, "Mr. Reynolds, if the purchasers here have the largest claims in the case, what are they really going to pay?"  Tr. 12.

laundering the corporate assets through an innocent trustee?  Should this court authorize a sale that

may be tainted?

## Conclusion

The court has made no findings of fact or conclusions of law, but the motion appears more

complex than the pleadings suggest.  The issues go beyond the evidentiary issue of the existence of

the May 9, 2003 preliminary injunction and whether a bond was posted before the May 10, 2003

shareholder's meeting.[24]  If the debtor proves the existence of the prior injunction and the timely

posting of the required bond, has there been a manifest injustice?  Perhaps the court reached the right

result even though it may now appear to have been for the wrong reasons.  Manifest injustice goes

beyond the narrow evidentiary issue and the presumptive different result.  It goes to the entirety of

the proceedings in this case, starting with the filing of the petition.  It is not necessary or appropriate

to resolve the actual shareholder dispute to determine whether there has been a manifest injustice.

That resolution is available on the merits in another forum.  The parties have been pursuing it for

more than two years.  The focus here is whether the filing of this case was intended to or did in fact

give an unfair advantage to one of the parties that she did not have in the state court proceeding and

---

[24]The May 9, 2003 preliminary injunction raises its own questions.  Mr. Nelson testified that Judge Millette "enjoined 555 shares which in this case would be the swing amount for majority."  Tr. 26.  The May 9, 2003 order is signed by the Hon. Richard B. Potter, a judge of the Prince William County Circuit Court, although Judge Millette's name is typed below the signature line.  There is an endorsement block for Mr. Cerroni, with "SEEN AND OBJECTED TO" typed above his signature line.  He did not endorse the order, but Judge Potter handwrote,  "Did appear at motions day as per Clerk's notes."  Mr. Cerroni appears to have been surprised at the shareholder's meeting the following day, Saturday, May 10, 2003.  The May 30, 2003 preliminary injunction is on the same form as the May 9, 2003 preliminary injunction but with different interlineations.  The differences in the two orders is telling.  Judge Millette's order preserves the status quo.  Judge Potter's order markedly shifts the voting power from Ms. Sethanand to the Raungtriphop group for a shareholder's meeting known to be scheduled for the day after the hearing.  These questions need not be answered. It does not appear to be relevant as to whether Judge Millette heard the motion and Judge Potter signed the order later in the day and, if so, whether the May 9, 2003 order accurately reflected the morning's ruling.  The May 9, 2003 order once entered is the order of the Circuit Court whether it accurately reflected to court's ruling or not.

whether that advantage affected shareholder rights and protections that would otherwise have been protected in the state court proceeding.  If so, perhaps relief from the order of August 12, 2005 is not available under Rule 59(e) on grounds of manifest injustice, even if it was predicated on erroneous evidence.

The immediate question is whether to grant the request for an expedited hearing.  The court has weighed the effect of the August 12, 2005 order, the possible and likely consequences of the order, the complexity of the issues presented, the need for time to adequately prepare and the need for an early hearing.  One of the great benefits of the Bankruptcy Code and of bankruptcy procedure is its flexibility in addressing ever-changing economic issues on a timely basis.  In most cases, they are successfully addressed as they arise.  The disadvantage of the piecemeal approach is that there is never a single hearing where all of the factors are presented and considered and where a single, comprehensive resolution reached.  In complex cases that would be impossible. Here, however, the  disadvantages of the piecemeal approach are apparent in retrospect.  Each decision made appeared proper at the time.  However, with the benefit of all the pleadings, statements, arguments and evidence, while individually correct, as a whole they may have been in error.  Adequate time is necessary to properly prepare for what may be a rather complex hearing.  The restaurant, while endangered, is endangered more by the Raungtriphops implicit threat to walk away from it than anything else. That is a risk that they, as the movants for the expedited hearing, control.

The motion for an expedited hearing will be denied.  The August 12, 2005 order dismissing the case will be stayed until further order of this court. The trustee will be authorized to operate the

restaurant under §721.  An early, but not expedited, hearing will be set for a date certain.  Discovery

response deadlines will be shortened.

      Alexandria, Virginia
      August 26, 2005

                           /s/ Robert G. Mayer
                           Robert G. Mayer
                           United States Bankruptcy Judge

cc:

Kevin M. O'Donnell
James W. Reynolds
Russell B. Adams, III
Jack Frankl
Mitchell B. Weitzman

12366